SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court and may not summarize all portions of the opinion.

## In re Opinion No. 735 of the Supreme Court Advisory Committee on Professional Ethics (A-61/62-19) (083396)

**Argued September 24, 2024 -- Decided May 22, 2025**

**NORIEGA, J., writing for the Court.**

This case presents the narrow question of whether it is permissible under the Rules of Professional Conduct (RPC) for an attorney or law firm to purchase a competing attorney's or law firm's name as a keyword from internet search engine providers, such as Google, Yahoo, or Bing. Specifically, whether John Doe, Esq., may purchase the name of Jane Smith, Esq., as a keyword such that when a user searches for "Jane Smith," a sponsored link to John Doe's website appears prominently above organic search results for "Jane Smith." This practice is known as "competitive keyword advertising."

The Advisory Committee on Professional Ethics (ACPE) received two related inquiries pertaining to attorney online advertising. The first inquiry -- the subject of this appeal -- asked whether competitive keyword advertising that uses a competing attorney's or law firm's name violates the RPCs. The second -- not on appeal -- concerned the propriety of embedding a hyperlink in a competitor attorney's name such that a click on the competitor's name redirects the user to the purchasing attorney's website. In its June 25, 2019 opinion, the ACPE concluded that the purchase of another lawyer's or law firm's name in competitive keyword advertising does not violate the RPCs, while hyperlinking a competitor's name does violate 8.4(c). No party has challenged the ACPE's determination of the second question.

The Court granted petitions from the New Jersey State Bar Association, 241 N.J. 391 (2020), and the Bergen County Bar Association, 241 N.J. 392 (2020), for review of Opinion 735 pursuant to Rule 1:19-8. After oral argument in November 2020, the Court remanded the matter and appointed a Special Adjudicator to make specific factual findings about the mechanics of keyword searches and their capacity to mislead. 260 N.J. 331 (2021). The Bar Associations participated in the remand proceedings, which included testimony by three experts and feedback from members of the bar whose names or firm names had been purchased as keywords by competitors. The Court reviews the record in detail.

1

The Special Adjudicator submitted his report in June 2024. He described how search engine algorithms determine ad placement based on various factors, including bid amounts, keyword relevance, and ad quality scores. He noted that ads typically appear above organic results, and while marked with identifiers like "Ad," "Sponsored," or "Promoted," their visibility and user recognition vary. Ultimately, the Special Adjudicator found that the current RPCs were sufficient to contend with any allegations of deception, dishonesty, fraud, or misrepresentation alleged via competitive keyword purchase of attorneys' or law firms' names and therefore recommended no changes to the RPCs.

**HELD:** The practice of purchasing a competitor's name as a keyword does not, in itself, constitute a violation of the RPCs. However, the Court requires that attorneys employing this strategy include a clear and conspicuous disclaimer on the landing page of their website when a user clicks on such a paid advertisement.

1. The Court first considers whether purchasing the proper name or law firm name in competitive keyword advertising is a "communication" within the meaning of RPCs 7.1 and 7.2. RPC 7.2 permits lawyers to advertise "[s]ubject to the requirements of RPC 7.1." RPC 7.1(a), in turn, provides that "[a] lawyer shall not make false or misleading communications about the lawyer, the lawyer's services, or any matter in which the lawyer has or seeks a professional involvement," and explains what renders a communication false or misleading. The Court has found violations of RPC 7.1 when attorneys or their representatives make misrepresentations in the content of their advertising. The dispute in this case, however, is not over the content of an advertisement, but rather the placement of it. The purchase of a keyword -- that is, an attorney's attempt to raise his profile in the sponsorship section of a search result -- is not in and of itself a communication subject to RPC 7.1 or RPC 7.2. Indeed, it is a form of proximity marketing, whereby businesses intentionally position themselves near a market leader to benefit from their overflow customers. So long as the purchasing of the keywords does not create a false or misleading suggestion that the advertiser is affiliated with the object of the search, efforts made to enhance visibility do not amount to communication under RPC 7.1 and 7.2. (pp. 19-22)

2. The Court also holds that purchasing the proper name of an attorney or a law firm as competitive keywords does not violate RPC 8.4(c), which establishes that it is professional misconduct for a lawyer to "engage in conduct involving dishonesty, fraud, deceit or misrepresentation." In New Jersey, violations of RPC 8.4(c) require a showing of deliberate and intentional conduct designed to mislead. The current record, however, contains no evidence of such intent. Purchasing a competitor's name as a search term does not divert users to a misleading website or falsely imply affiliation. It simply ensures that an attorney's sponsored ad appears alongside search results -- a practice common across industries and widely understood by

consumers navigating the internet.  The Court does not hold that competitive keyword advertising can never be misleading or deceitful under RPC 8.4(c).  However, given the absence of evidence showing any intent to mislead, the widespread and accepted nature of keyword advertising, and the functioning of modern search engines, the Court concludes that the practice of purchasing a competitor's name as a keyword -- without more -- does not constitute a violation of RPC 8.4(c).  The Court also finds that the alleged conduct does not violate RPC 8.4(d), which makes it professional misconduct for lawyers to engage in conduct that is "prejudicial to the administration of justice."  (pp. 22-32)

3.  To enable attorneys to advertise using the most state-of-the-art technology while protecting the interests of the public, the integrity of the legal profession, and the administration of justice, the Court now requires a precautionary disclaimer to assure that New Jersey attorneys continue to advertise in a way that is transparent and ethical.  Any attorney who purchases the name of a competitor attorney or a law firm's name as part of a keyword advertising campaign, must now include the following disclaimer on any landing page to which the paid ad directs a consumer:

> You arrived at this page via a paid advertisement on [insert name of search engine provider] through paid keyword search results.  This website and the legal business it describes are affiliated only with [insert name of purchasing attorney] and the other attorneys referenced within this website.  (pp. 33-34)

**AFFIRMED AS MODIFIED.**

**JUSTICE FASCIALE, dissenting,** stresses that attorneys spend their entire careers building a reputation and would hold that the method of advertising at issue in this appeal -- to secretly and without consent appropriate for oneself the earned good will and reputation of another lawyer or firm solely for personal financial gain -- violates RPC 8.4(c).  Justice Fasciale expresses the view that competitive keyword advertising involves intentional conduct because it requires several deliberate steps.  Justice Fasciale notes that most jurisdictions to consider the question have held that competitive keyword advertising violates their respective versions of RPC 8.4(c) and explains that holding otherwise is a departure from the tradition of holding attorneys to the highest ethical standards.  Justice Fasciale would adopt the State Bar Association's proposed comment to RPC 8.4(c), which would make clear that the practice at issue here would be an ethical violation.

**CHIEF JUSTICE RABNER and JUSTICES PATTERSON and WAINER APTER join in JUSTICE NORIEGA's opinion.  JUSTICE FASCIALE filed a dissent.  JUSTICE PIERRE-LOUIS did not participate.**

3

# SUPREME COURT OF NEW JERSEY

## A-61/62 September Term 2019

## 083396

In re Opinion No. 735 of the Supreme Court
Advisory Committee on Professional Ethics.

On petitions for review of a decision of the Supreme
Court Advisory Committee on Professional Ethics.

| Argued | Remanded | Special Adjudicator Report |
|--------|----------|----------------------------|
| November 10, 2020 | October 1, 2021 | June 7, 2024 |

| Re-Argued | Decided |
|-----------|---------|
| September 24, 2024 | May 22, 2025 |

Bonnie C. Frost argued the cause for appellant New Jersey State Bar Association (New Jersey State Bar Association, attorneys; William H. Mergner, Jr., President, Evelyn Padin, and Kimberly A. Yonta, of counsel and on the briefs, and Bonnie C. Frost and Sharon A. Balsamo, on the briefs).

Andrew J. Cevasco argued the cause for appellant Bergen County Bar Association (Archer & Greiner and Harwood Lloyd, attorneys; Andrew J. Cevasco and Thomas Loikith, on the briefs).

Donna Arons, Assistant Attorney General, argued the cause for respondent Supreme Court Advisory Committee on Professional Ethics (Matthew J. Platkin, Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel, and Donna Arons, on the briefs).

Ryan J. Gaffney argued the cause for amicus curiae New Jersey Defense Association (Chasan Lamparello Mallon & Cappuzzo, attorneys; Ryan J. Gaffney on the brief).

1

Shalom D. Stone argued the cause for amicus curiae New Jersey Civil Justice Institute (Stone Conroy, attorneys; Shalom D. Stone, of counsel and on the briefs).

Bruce D. Greenberg submitted a brief on behalf of amicus curiae Masters Marketing Group (Lite DePalma Greenberg and Law Offices of Howard J. Bashman, attorneys; Bruce D. Greenberg, of counsel and on the brief, and Howard J. Bashman, on the brief).

JUSTICE NORIEGA delivered the opinion of the Court.

"Keyword advertising" is a common online marketing practice whereby advertisers bid on and purchase a keyword or phrase from internet search engine providers, such as Google, Yahoo, or Bing. When a user searches for a term that has been purchased, sponsored links appear -- typically marked as "Ad," "Sponsored," or "Promoted" -- above or alongside the "organic" search results generated by the search engine's algorithm.

In our profession, keyword advertising is now a widespread means of attorney online advertising. Attorneys and law firms regularly purchase keywords related to practice areas or geographic regions. An attorney might purchase the phrase "personal injury attorney," causing their website to appear among the top sponsored results when the term is searched locally.

This case presents the narrow question of whether it is permissible under the Rules of Professional Conduct (RPC) for an attorney or law firm to

purchase a competing attorney's or law firm's name as a keyword. Specifically, whether John Doe, Esq., may purchase the name of Jane Smith, Esq., as a keyword such that when a user searches for "Jane Smith," a sponsored link to John Doe's website appears prominently above organic search results for "Jane Smith." This practice is known as "competitive keyword advertising."

The Advisory Committee on Professional Ethics (ACPE), in Opinion 735, concluded that such conduct does not violate the RPCs. ACPE Op. 735, 225 N.J.L.J. 2155, 2156 (Aug. 12, 2019). We agree and hold that the practice of purchasing a competitor's name as a keyword does not, in itself, constitute a violation of the RPCs. However, consistent with our past treatment of emerging forms of attorney advertising, we now require that attorneys employing this strategy include a clear and conspicuous disclaimer on the landing page of their website when a user clicks on such a paid advertisement. We therefore affirm Opinion 735, as modified.

I.

A.

The ACPE received two related inquiries pertaining to attorney online advertising. Id. at 2155. The first inquiry -- now before us -- asked whether competitive keyword advertising that uses a competing attorney's or law

3

firm's name violates the RPCs. The second -- not before us -- concerned the propriety of embedding a hyperlink in a competitor attorney's name such that a click on the competitor's name redirects the user to the purchasing attorney's website. In its June 25, 2019 opinion, the ACPE concluded that the purchase of another lawyer's or law firm's name in competitive keyword advertising does not violate the RPCs, while hyperlinking a competitor's name does violate 8.4(c). Id. at 2156. No party has challenged the ACPE's determination of the second question, which is why only the first determination is at issue before us.

The ACPE agreed with an earlier determination by the Committee on Attorney Advertising (CAA) that purchasing a competing attorney's name as a keyword is not a "communication" within the scope of RPCs 7.1 and 7.2,[1] and therefore not subject to their restrictions. Id. at 2155. The ACPE also concluded that purchasing a competitor's name does not constitute dishonesty,

---

[1] The ACPE also concluded that competitive keyword advertising does not violate RPC 1.4 because that rule "provides that a lawyer shall inform a prospective client of how, when[,] and where the client may communicate with the lawyer," and a keyword purchase does not involve an "interaction, much less communication, between the lawyer who purchases a competitor lawyer's name as a keyword and the person searching on the internet." No party challenges that determination.

fraud, deceit, or misrepresentation under RPC 8.4(c), nor is it prejudicial to the administration of justice under RPC 8.4(d).  Id. at 2155-56.

The ACPE reviewed several other jurisdictions' approaches to this issue in addressing RPC 8.4(c)'s prohibition on "dishonesty, fraud, deceit, or misrepresentation" and ultimately adopted the reasoning of Texas and Wisconsin, finding that "purchasing keywords of a competitor lawyer's name is not conduct that involves dishonesty, fraud, deceit, or misrepresentation." Id. at 2156.  The ACPE relied on the notion that the websites of the purchasing attorney and the competitor "will, presumably, both appear in the resulting search" -- the purchasing attorney's link as a sponsored ad, and the competitor's link as an organic search result.  Ibid.  Additionally, the ACPE stressed that search engines will ordinarily "mark the keyword-purchased website as paid or 'sponsored,'" and an internet user can then "choose which website to select."  Ibid.  According to the ACPE, "[t]his is not deceptive, fraudulent, or dishonest conduct within the meaning of [RPC] 8.4(c)."  Ibid.

The ACPE also found no violation of RPC 8.4(d)'s prohibition on "conduct that is prejudicial to the administration of justice."  Ibid.  The committee reasoned that purchasing a competitor's name as a keyword does not meet the standard of RPC 8.4(d), which applies only "to 'particularly egregious conduct,' or conduct that 'flagrantly violat[es] . . . accepted

5

professional norms." Ibid. (alteration and omission in original) (quoting In re Helmer, 237 N.J. 70, 83 (2019)).

B.

On May 5, 2020, we granted petitions from the New Jersey State Bar Association (NJSBA), 241 N.J. 391 (2020), and the Bergen County Bar Association (BCBA), 241 N.J. 392 (2020), for review of Opinion 735 pursuant to Rule 1:19-8. We also granted motions from the New Jersey Defense Association (NJDA), Masters Marketing Group (Masters), and the New Jersey Civil Justice Institute (NJCJI), to appear as amici curiae.

After oral argument in November 2020, we remanded the matter and appointed the Honorable Jeffrey R. Jablonski, A.J.S.C., as Special Adjudicator. 260 N.J. 331 (2021). We directed him to conduct a detailed factual analysis of the following issues:

> 1. Purchasing options available for keyword search terms at the top three internet search engines utilized in the United States; the payment structure for purchasing keyword search terms; whether there are different categories or levels of keyword search term advertising that can be purchased; whether/how charges accrue if internet users click on paid keyword advertisements; how internet search engine advertisement auctions are conducted; the benefit(s) the purchaser obtains in purchasing a keyword search term; and whether a person has the ability to be the exclusive purchaser of a particular keyword search term;

6

2. The manner in which internet search engines differentiate between search results for paid keyword advertisement and organic search results, including whether paid keyword advertisement search results are designated with words such as "Ad" or "Advertisement," and if so, the size, font, color, and location of the word compared to the rest of the words in the search result list;

3. The placement of the search results for paid keyword advertisements and where they appear in the list of search results in relation to the placement of organic search results, including whether paid keyword advertisements obtain priority placement and are listed above the organic results; whether paid keyword advertisement search results appear each time a person searches for the paid keyword term; whether paid keyword advertisement search results are located in the same place in the search results list each time a search of the keyword is conducted; and how the placement of paid keyword advertisement search results is determined;

4. What occurs with the search results when a keyword search is conducted but the lawyer whose name was purchased and searched does not have a website; and

5. Whether the search result list appears the same regarding the lineup of paid keyword advertisement search results and organic search results when a search of the keyword search term is conducted on a mobile device versus on a laptop or desktop computer . . . .

[Id. at 332-33.]

The Court further ordered:

that the Special [Adjudicator] shall research and consult empirical data on whether paid keyword

7

advertisement search results are misleading to the average internet search engine user and whether the average internet search engine user is able to differentiate between paid keyword advertisement search results and organic search results . . . .

[Id. at 333.]

The NJSBA and BCBA participated in the remand proceedings, which included three experts: John S. Miko, D.Ed., MBA, PMP; Ross A. Malaga, Ph.D.; and Steven W. Teppler, Esq., all of whom provided testimony on digital marketing, e-commerce, search engine analytics, and pay-per-click advertising, as well as advertising features and effectiveness generally. They also testified regarding their review of any existing empirical data concerning whether paid advertising search results are misleading to the average internet user and whether users can distinguish between paid and organic results.

Regarding this last specific area of inquiry, Miko acknowledged that "[a] search of existing literature did not uncover much in the way of recent research on the topic." While Miko referenced early Federal Trade Commission (FTC) regulations that recognized the potential for online advertising to mislead consumers and directed that such content must be "noticeable and understandable" to the average user, he noted that the FTC has not updated those regulations since 2013. Miko cited only two studies relevant to the inquiry: first, a 2020 study by Sebastian Schultheiß and Dirk Lewandowski

involving 100 participants, which found that "users with a limited understanding of search advertising were prone to clicking on ads compared to their more informed counterparts"; and second, a 2019 study by Clutch.co, based on a survey of 500 individuals, which reported "that 77% of respondents felt confident that they could identify paid advertisements and distinguish them from organic listings" and "75% of respondents said that paid search ads make it easier to find the information they are searching for via a search engine." Miko concluded, without offering empirical support beyond the cited surveys, "given the complexity of today's [search engine results pages], that it may be sometimes difficult to distinguish between organic and paid search results."

Malaga similarly relied on a limited number of sources and reached the same general conclusion as Miko. Malaga cited three studies: one from Lewandowski and Schultheiß, published in <u>Behaviour & Information Technology</u> in 2023, on public awareness and attitudes towards research engine optimization, which reported that "29.2% of Internet users in Germany know how paid search ads differ from organic search results"; a 2018 survey by UK-based Varn Media indicating that "57.5% of their survey participants

9

did not recognize Google ads"; and a 2022 Varn Media survey that found that 68.2% of respondents were unable to recognize a Google advertisement.[2]

The third expert, Teppler, asserted that,

> [d]epending on the format, content, and placement, and repetitive nature of a paid keyword advertisement, the average internet search engine user may not be easily able to differentiate between a paid keyword advertisement search and what are commonly referred to as "organic" results.

Despite Teppler's general opinions about user confusion, he cited no research supporting that proposition.[3]

During the remand proceedings, the Special Adjudicator also requested feedback from members of the bar whose names or firm names had been purchased as keywords by competitors.[4]  Six attorneys and one law firm

---

[2]  It is unclear whether the respondents in Varn Media's surveys are limited to persons in the UK.  One of the surveys states "every six months in the UK, we have conducted a survey online asking over a [thousand] people across all age groups:  do you know which links on the Google search results page are paid adverts?"  The Latest Google Ads Research from Varn 2022, Varn Media (Sept. 22, 2022) (emphasis added), https://varn.co.uk/09/22/latest-google-ads-research-2022-varn.

[3]  Teppler did reference two articles purporting to show that users perceive organic search results as more trustworthy than paid advertisements; one of those articles could not be located for independent verification, and the other included no studies or data supporting that conclusion.

[4]  The Special Adjudicator offered the same opportunity to keyword-purchasing attorneys and firms, but none completed interrogatories.

marketing consultant responded with certifications describing how they discovered the use -- in some cases alleged use only -- of their names and whether they experienced any resulting harm.

Of the seven responses, two included confirmed instances of the type of competitive keyword advertising at issue here -- Attorney One and Attorney Two.[5] Two respondents alleged but were unable to confirm the practice -- Attorney Three and Attorney Four. The remaining three responding attorneys described instances of malfeasance related to attorney advertising, but not germane to the issue before us now.[6]

Attorney One explained that eight to ten years ago, an accountant he had retained as an expert witness advised him that he had accidentally called another law firm after dialing the number that appeared in a Google search for

---

[5] The seven attorneys voluntarily provided evidence to the Special Adjudicator regarding their experience with this issue. Because we did not advise them in advance that their names might be used in this opinion, we substitute "Attorney #" for each of the affiants.

[6] Attorney Five reported that a search of her name produced a result showing her photo and name alongside a law firm with which she had no affiliation. Attorney Six described how her former employer embedded her name in the firm's metadata, causing her name to appear in search results linked to that firm even after her departure. Attorney Seven submitted an interrogatory detailing how another firm embedded his firm name within its website, so that when an internet user searched [Attorney Seven's firm name] a link would appear reflecting that name, but containing the address and phone number for the purchasing lawyer's website -- which, if confirmed, is strictly prohibited.

Attorney One's name. Attorney One then searched his own name and found that another law firm's link came up first offering free consultations for divorce actions. Attorney One called the firm; after it internally analyzed the issue, the firm's owner admitted that his new webmaster had begun using competitors' names to increase traffic to the firm's website. The firm also informed Attorney One that it would voluntarily stop the practice. Attorney One explained that neither his name nor his firm name was in the ad copy or in the link for the purchasing attorney's website; he did not possess any records of the search results page; and he could not identify any damages he suffered as a result of the advertising strategy.

Attorney Two described having searched for his firm name on Google and seeing the name of another attorney appear in the search results. Attorney Two contacted that attorney, who admitted that his marketing department purchased competitors' names as keywords and agreed to stop the practice. Attorney Two searched for his own firm name again and learned that the practice had not stopped. He filed a cease and desist letter, followed by an order to show cause. The purchasing attorney once again agreed to end the practice, and a stipulation of dismissal was entered between the parties. Attorney Two reported that it was impossible to know whether any damages

12

resulted from this conduct. There was no indication that the purchasing attorney's website link contained any information related to Attorney Two.

In the affidavits that lacked confirmation, Attorney Three explained that between four and five years ago she contacted her firm's search engine optimization (SEO) professional because when she searched her own firm's website, a competitor's law firm would come up in the search results ahead of her own firm. Her SEO professional advised her that this was likely because her competitor "was buying Google adwords containing [her] firm name." She called the ethics hotline to determine her options and was informed that the conduct was legal, which was confirmed by her marketing team. Attorney Three could not identify any damages suffered as a result of the practice. She also explained that her marketing team reviews her placement in search results regularly and the practice has not occurred since she initially noticed it.

Attorney Four reported that he was contacted by a prospective client who had "tried to access [Attorney Four's] name on a keyword search and when they did that, another Hackensack, New Jersey firm identity/email came up on that search." He was no longer in possession of the record regarding the date of that communication, though it was the second time the issue had been brought to his attention. Attorney Four reported that he had a conversation with his local bar association representative and voiced his concerns regarding

13

this practice. Attorney Four reports that he is not aware whether the activity persists.

## C.

The Special Adjudicator submitted his report in June 2024. He described how search engine algorithms determine ad placement based on various factors, including bid amounts, keyword relevance, and ad quality scores. He noted that ads typically appear above organic results, and while marked with identifiers like "Ad," "Sponsored," or "Promoted," their visibility and user recognition vary. He noted that keyword ownership is not exclusive -- multiple advertisers may bid on the same name or term. The report stated that keyword marketing campaigns offer significant benefits to organizations because they "allow advertisers to target specific keywords, locations, devices, times and day," and "can be adjusted very quickly."

The report noted but did not identify recent research suggesting "most users have a difficult time telling the difference between" organic and paid advertising search results. However, the report also explained that the experts agreed that advertising results do not necessarily have an advantage over organic results because "[p]roperly optimized websites that follow search engine guidelines lead to more effective organic listings, which are often considered as more authentic and trustworthy than the paid keyword."

14

Although proprietary software controls the inner workings of the three major internet search engines in the United States -- Google, Bing, and Yahoo -- the parties' experts were able to provide insight into how different categories of keyword advertising operate and the different payment structures available. For example, Bing and Yahoo charge an advertiser every time a user clicks on an ad, while Google offers that option as well as additional "payment options including costs-per-thousand viewable structure for display ads, cost-per-acquisition, and return-on-ad-spending models," the report found.

The Special Adjudicator found that factors like "the bid amount, ad quality score, ad extensions providing more information that improves the visibility and relevance of an ad, keyword relevance, targeted settings, and advertisement schedules," all contribute to whether an advertisement will appear in response to a user's search for a specific paid keyword. Advertisers thus attempt to "optimize their ads by selecting the right keywords, crafting compelling ad copy, setting an appropriate bid amount, and ensuring that the landing page provides the information requested." Yet, the report explained, "[t]here is no guarantee that a paid advertisement will appear" when an advertiser's keyword is searched, especially since none of the major search engines permit exclusive purchase of keywords, meaning that more than one business may purchase the same keywords. Additionally, the report

15

highlighted that search engines restrict certain advertising content: "[a]dvertisements cannot be misleading and must also comply with all other content-based guidelines set forth by the" internet search engine companies.

Ultimately, the Special Adjudicator found that the current RPCs were sufficient to contend with any allegations of deception, dishonesty, fraud, or misrepresentation alleged via competitive keyword purchase of attorneys' or law firms' names. Therefore, he recommended no changes to the RPCs.

After the Special Adjudicator submitted his report, we received supplemental briefing by the parties.

## II.

Petitioner NJSBA urges the Court to declare keyword advertising using a competitor attorney's name inherently misleading and dishonest in violation of RPC 8.4(c), and asks for a comment to the rule explaining as much. It cites user confusion, as referenced in the Special Adjudicator's findings, and argues that most users have difficulty differentiating between organic and paid advertising searches because the differences are nuanced. It argues that this form of advertising creates a connection between the competitor and the advertiser that does not exist. It also contends that this kind of keyword advertising exploits the reputation of the more prominent attorney, "or at least puts the purchasing law firm in front of their competitor's potential clients,"

16

which "is at best misleading and at worst, dishonest and deceitful." NJSBA acknowledges, however, that no harm has been shown in practice -- no diverted clients, no quantifiable losses, and no documented examples of deception.

Petitioner BCBA also asks the Court to find the practice of competitive keyboard advertising inherently misleading. While acknowledging the Special Adjudicator's suggested steps that an attorney might take to defend against such advertising techniques, BCBA argues that "[i]nnocent attorneys should not be forced -- to their own financial detriment -- to defend against another attorney's deceptive conduct." BCBA argues that the existence of search engines' advertising policies cannot replace the RPCs, especially when search engine companies have "an economic incentive to direct consumers to an advertiser's website."

Amici curiae NJDA and Masters echo the positions of the Petitioners. Masters also argues that their members have had their names "hijacked" by competitors using this practice and that consumers have a high likelihood of being tricked into hiring an unintended lawyer or law firm based on misleading advertising results.

On the other side, Respondent ACPE argues that the practice of purchasing a competitor's or law firm's name in keyword advertising is not

17

inherently dishonest, fraudulent, deceitful, or a misrepresentation, and does not violate any RPC.  As to RPC 8.4(c), the ACPE argues that the practice is not deceptive because users "can readily see that a particular result does not relate to the search term they used."  The ACPE contends that "so long as the attorney's advertisement . . . does not in any way suggest that they have an association with the searched-for attorney," then the advertising attorney has not committed misrepresentation.

As to RPC 8.4(d), the ACPE argues that the rule is confined to "particularly egregious conduct" and conduct "that flagrantly violat[es] . . . accepted professional norms." (quoting Helmer, 237 N.J. at 83).  RPC 7.1, according to the ACPE, is sufficient to prevent confusing or misleading advertising on the internet.  Finally, the ACPE suggests, as a precautionary measure, that this Court could "consider amending Attorney Advertising Guideline 1 to say that any such advertisement must also clearly indicate the name of the advertising attorney or firm."

Amicus curiae NJCJI argues that RPC 8.4 is too broad for the nuanced question before the Court, and so either RPC 7.1, RPC 7.2, or a new rule or guideline is more suitable to address the question presented.  Contrary to the ACPE's position, the NJCJI asserts that displaying the lawyer's own website in the search results qualifies as a "communication" subject to RPC 7.1.

18

III.

A.

The Supreme Court has plenary authority to regulate the legal profession in New Jersey. N.J. Const. art. VI, § 2, ¶ 3, cl. 2 ("The Supreme Court shall have jurisdiction over the admission to the practice of law and the discipline of persons admitted.").

B.

We begin our analysis by determining whether purchasing the proper name or law firm name in competitive keyword advertising is a "communication" within the meaning of RPCs 7.1 and 7.2.

RPC 7.2 permits lawyers to advertise "through public media, such as . . . [the] internet or other electronic media" and governs how they do so. Notably, RPC 7.2(a) expressly renders that permission "[s]ubject to the requirements of RPC 7.1." RPC 7.1(a), in turn, provides that

> [a] lawyer shall not make false or misleading communications about the lawyer, the lawyer's services, or any matter in which the lawyer has or seeks a professional involvement. A communication is false or misleading if it:
>
> (1) contains a material misrepresentation of fact or law, or omits a fact necessary to make the statement considered as a whole not materially misleading;

(2) is likely to create an unjustified expectation about results the lawyer can achieve, or states or implies that the lawyer can achieve results by means that violate the [RPCs] or other law; [or]

(3) compares the lawyer's services with other lawyers' services, unless (i) the name of the comparing organization is stated, (ii) the basis for the comparison can be substantiated, and (iii) the communication includes the following disclaimer in a readily discernable manner: "No aspect of this advertisement has been approved by the Supreme Court of New Jersey" . . . .

We have found violations of RPC 7.1 when attorneys or their representatives make misrepresentations in the content of their advertising. For example, In re Pajerowski held that a lawyer violated RPC 7.1(a) by soliciting accident victims through a nonlawyer "runner" who, on at least one occasion, told a potential client that "respondent would obtain a larger monetary award for her than any other attorney." 156 N.J. 509, 513, 515 (1998); see also In re Caola, 117 N.J. 108, 111-12 (1989) (issuing a public reprimand to a lawyer who inflated his credentials in a solicitation letter mailed to a police officer under criminal indictment, based on RPC 7.1(a)(1)'s prohibition on material misrepresentations of fact or law).

The dispute in this case, however, is not over the content of an advertisement, but rather the placement of it. The initial inquiry to the CAA and the ACPE did not raise issues with the substance or wording of a

20

purchasing attorney's advertisement -- the inquiry was specifically about the purchase of an attorney's name as a competitive keyword, which affects where the purchasing attorney's link appears in relation to the competitor attorney's link.

A sponsored link for an attorney's services, labeled as an advertisement, merely advises an internet user (a) of a potential competitor of the searched-for name and (b) that the potential competitor paid a fee for its link to be included among the results for the user's search. The purchase of a keyword -- that is, an attorney's attempt to raise his profile in the sponsorship section of a search result -- is not in and of itself a communication subject to RPC 7.1 or RPC 7.2. Indeed, it is a form of proximity marketing, whereby businesses intentionally position themselves near a market leader to benefit from their overflow customers.

Proximity marketing is not automatically a communication; nor is it intrinsically deceitful or fraudulent. Attorneys who position themselves next to a more successful competitor, whether digitally or physically, may find themselves in a position to offer services to clients that their more successful counterpart turned away or could not retain; such is the nature of competitive advertising. So long as the purchasing of the keywords does not create a false or misleading suggestion that the advertiser is affiliated with the object of the

21

search, efforts made to enhance visibility do not amount to communication under RPC 7.1 and 7.2.

We therefore agree with the CAA and ACPE's conclusion that the act of purchasing a competitor's name does not itself violate RPC 7.1 or 7.2.

C.

We also hold that purchasing the proper name of an attorney or a law firm as competitive keywords does not violate RPC 8.4(c), which establishes that it is professional misconduct for a lawyer to "engage in conduct involving dishonesty, fraud, deceit or misrepresentation."

RPC 8.4(c) has traditionally governed matters in which lawyers have deliberately engaged in misrepresentation or misconduct, typically evidenced by perpetuating falsehoods to clients. See, e.g., In re Kalma, 249 N.J. 538 (2022) (finding a violation when an attorney falsely communicated to his client that he had timely filed a complaint before the expiration of the statute of limitations (facts set forth in Disciplinary Review Board [DRB] decision)); In re Hyderally, 208 N.J. 453, 460-62 (2011) (dismissing an ethics complaint for lack of clear and convincing evidence that an attorney had intentionally used the New Jersey Supreme Court Certified Attorney seal without proper authorization on his website); In re Morell, 184 N.J. 299, 306 (2005) (disbarring an attorney for "dishonesty, fraud, and deceit" for lying to a client

22

about initiating, settling, and concluding his litigation); <u>In re Stahl</u>, 198 N.J. 507 (2009) (finding that an attorney violated RPC 8.4(c) by knowingly making false statements and offering false evidence to a tribunal (facts set forth in DRB decision)); <u>In re Marshall</u>, 196 N.J. 524 (2008) (finding that an attorney violated RPC 8.4(c) by knowingly creating fictitious real estate documents that she knew were relied on by a third party (facts set forth in DRB decision)); <u>In re Tan</u>, 188 N.J. 389 (2006) (finding a violation of RPC 8.4(c) when an attorney knowingly made false statements about his educational background on his bar application (facts set forth in DRB decision)).

Multiple jurisdictions have considered whether purchasing a competitor's name as a keyword in online advertising violates professional conduct rules, and the results are mixed. Texas, South Carolina, and Florida have generally concluded that the practice does not, in itself, constitute dishonest or misleading conduct under rules analogous to RPC 8.4(c), especially when the resulting ad is clearly labeled as "sponsored" and does not impersonate or misrepresent a relationship with the competitor.[7] These opinions emphasize user familiarity with

---

[7] <u>See</u> State Bar of Tex. Pro. Ethics Comm. Op. No. 661 (July 2016); S.C. Bar Ethics Advisory Op. 20-01 (2020); State of Fla. Bar Bd. of Governors Meeting 12.13.13. <u>See also</u> <u>Habush v. Cannon</u>, 828 N.W.2d 876, 885 (Wis. Ct. App. 2013) (holding that a lawyer's use of competitive keyword advertising did not constitute "use" of a competitor's name under Wisconsin's statutory right to privacy).

search engines and the expectation that advertising may appear alongside organic results.

In contrast, North Carolina has taken a stricter view, finding that such keyword use is deceptive and violates their equivalent misconduct rule because it lacks fairness or straightforwardness. N.C. State Bar 2010 Formal Ethics Op. 14 (2012). Maryland has also found the practice violates its version of RPC 8.4(c), although the rule does not require specific intent to prove dishonesty or misrepresentation.[8]

Those varying perspectives illustrate the tension between evolving digital marketing strategies and longstanding professional ethics standards.

In New Jersey, violations of RPC 8.4(c), which prohibits conduct involving dishonesty, fraud, deceit, or misrepresentation, require a showing of deliberate and intentional conduct designed to mislead. The current record, however, contains no evidence of such intent. The submissions to the Special Adjudicator, while earnest, provided at most speculative claims about whether attorneys engaged in deliberate deception. Crucially, none of the attestations

---

[8] See Md. State Bar Ass'n Comm. on Ethics 2022-02 (finding a violation of 8.4(c)) is satisfied by behavior that fails to rise to the level of fraud or deceit and the "the purchase of a competitor's name as a keyword violates 8.4(c)" as conduct that evidences a "lack of honesty, probity or integrity, lack of fairness and straightforwardness or misrepresentation").

demonstrate that the advertising attorneys intentionally sought to mislead prospective clients.

Respondent presented interrogatories from seven individuals who suspected their names were used in keyword advertising campaigns. The ACPE acknowledged that misconduct may have occurred in three of those cases, with complaints immediately warranted in two of them. But none of those instances involved conduct central to the legal question before us: whether the purchase of a competitor's or law firm's name as a keyword, without more, constitutes a violation of the RPCs. Notably, in instances where the advertising attorney's website explicitly included the name of a competitor attorney or firm, the ACPE indicated that such conduct is already prohibited and, in fact, offered to file formal complaints in those cases.

Among the remaining four interrogatories, only Attorney One and Attorney Two provided any evidence suggesting that a purchasing attorney had in fact bought a competitor's name as a keyword. The other two were speculative in nature and lacked any confirmation of the practice.

The limited sample makes it difficult to determine how widespread the practice of purchasing competitor names as keywords truly is. Compounding the issue is the nature of the practice itself: absent a purchasing attorney's admission or detailed marketing report or plan, uncovering keyword purchases

25

often requires an ethics grievance without proof of misconduct. The accused attorney is then placed in the position of disproving an unconfirmed allegation -- essentially being asked to prove a negative. This result is troubling given the widespread use of competitive keyword advertising in the legal field and the overlap in purchased terms and website copy among competing lawyers and law firms.

The nature of search engine results further complicates the analysis. Petitioners' arguments presuppose that consumers searching for a specific attorney's name expect a singular, precise result, and are misled when other links appear. But that assumption fails to account for how search engines actually function. Simply entering an attorney's full proper name or a law firm's name will rarely yield a precise, exclusive result. Basic familiarity with a search engine would reveal that a solitary, definitive result from such a search is an anomaly. Miko explained that when search terms are entered into search bars, search engines scour their "indexes" to retrieve the results by analyzing the "semantic relationships between words and how they're used in a phrase or question," in addition to seeking simple direct keyword matches. The search engine even relies on the user's history and preferences, as well as their geographic location, when producing search results. Miko's point was that the search engine systems are designed to respond to sophisticated

26

consumers using complex search patterns to refine and narrow their searches, rather than users expecting one-for-one word search matches.

Both Texas and South Carolina concluded similarly and found it "highly unlikely that a reasonable [internet user] would be misled into thinking that every search result indicates that a lawyer shown in the list of search results has some type of relationship with the lawyer whose name was used in the search." State Bar of Tex. Pro. Ethics Comm. Op. No. 661 (2016); accord S.C. Ethics Advisory Op. 20-01 (2020); Fla. Bar, Bd. Review Comm. on Pro. Ethics, Agenda Item Summary, Item No: 20c (Mar. 2018) (concurring with Texas's view and citing Opinion No. 661). Thus, search results for a person's full name commonly yield numerous unrelated entries, especially when the search is not refined with additional identifying terms like location or specialty. It is unlikely that even a relatively unsophisticated user would assume that every result, including those marked "Ad" or "Sponsored," represents the person or firm they sought. Rather, users typically understand that further refinement is necessary to locate the intended subject. Indeed, the very existence of keyword advertising underscores the reality that users understand basic searches -- limited to general attributes like a name -- are often insufficient to yield precise, targeted results. It reflects a recognition

27

that effective searches typically require additional, more specific terms -- or key words -- to narrow the field.

Moreover, Petitioners assume that a user will invariably click the first result -- whether or not it includes the attorney's name they searched. This is so even where the first link may include words like "Ad," "Sponsored," or "Advertisement," and even when their proffered expert, Teppler, claimed that users "tend to perceive organic search results as more trustworthy than paid results," which suggests that users could differentiate paid results from organic ones.

Realistically, a search including only a proper name will likely retrieve hundreds of results of little value to a user. Even the most unsophisticated user seeking a specific lawyer will recognize the need to improve their search by targeting words like "lawyer," "attorney," "firm," "law," or "esq.," thereby taking such a search beyond the scope of the issues before us in this case, as those are likely search keywords that many attorneys use. Thus, the comparison of only the advertising link with the competitor's "correct" organic results link is an unrealistic representation of how search results appear. While users reasonably hope to locate their intended target on the first page of results, it is unfair to assume that a precise match will always appear as the top

result and that any intervening results should be labeled "misleading" or "deceitful."

Petitioners' argument that this practice has no legitimate purpose other than to deceive consumers and misdirect them to the purchasing attorney's website fails to appreciate the very nature of the advertising platform on which many attorneys are advertising their businesses. It also requires that we presume malicious intent on the part of the purchasing attorney to misdirect clients to their own website instead of the user's intended destination.

The dissent contends that the use of a competitor's name in this fashion is deceptive conduct that violates RPC 8.4(c) and raises First Amendment principles. We conclude that the dissent overstates both the conduct at issue and its effects.

First, there is no evidence in this record that the use of keyword advertising misleads or deceives the public. Purchasing a competitor's name as a search term does not divert users to a misleading website or falsely imply affiliation. It simply ensures that an attorney's sponsored ad appears alongside search results -- a practice common across industries and widely understood by consumers navigating the internet. The website links in question in this matter identified only the advertiser's firm by name and did not misrepresent the

29

advertiser's identity or services. To characterize this as "secretly trading" on another's goodwill ignores that transparency.

Additionally, the dissent's reliance on the scant and inconclusive research submitted to the Special Adjudicator by the three experts is misplaced. We are skeptical of the validity of the limited findings presented. The lack of specific details, such as information on the surveyed groups and the methodology used raises concerns about the reliability of the surveys' findings. And certain articles, such as the Lewandowski and Schultheiß's 2023 study, do not appear to address squarely the question at the heart of this matter -- whether users can differentiate between organic and paid search results.

Moreover, it appears some entities behind the surveys had a financial interest in the surveys' outcome, casting doubt on the impartiality of those results. One of the surveys by Varn Media, on which the dissent heavily relies, is essentially an advertisement: it concludes with a call to hire the company for improved website traffic through search engine optimization. The Latest Google Ads Research from Varn 2022, Varn Media (Sept. 22, 2022) ("Get in touch to find out more about how to perfect your own hybrid model of optimised organic SEO combined with paid search media."), https://varn.co.uk/09/22/latest-google-ads-research-2022-varn.

30

Second, the dissent's labeling of the practice as "leeching" is a rhetorical flourish unsupported by facts or precedent. No RPC prohibits competition, and the rules do not grant attorneys proprietary rights over their names in public search algorithms. In fact, prohibiting keyword advertising that that is not unfair competition would set a dangerous precedent, chilling permissible advertising and restricting consumer access to legal services based on vague allegations of reputation appropriation.

Taken to its logical conclusion, the dissent's reasoning would bar commonplace advertising practices. For example, under its view, an attorney who purchases a keyword like "Newark divorce lawyer" -- despite maintaining an office in a nearby suburb -- would be engaging in deception simply because the ad appears in response to a search regarding Newark. That approach would improperly conflate strategic visibility with dishonesty, effectively discouraging attorneys from using lawful digital tools to expand access to their consumers. This form of advertising is not misleading; it is standard competitive marketing aimed at reaching a broader audience. We therefore do not reach the dissent's First Amendment analysis.

We do not hold today that competitive keyword advertising can never be misleading or deceitful under RPC 8.4(c). Variations may exist that we cannot now anticipate, and attorneys remain bound by their ethical obligations in all

31

forms of advertising. Our focus here, however, is not on the mere use of a competitor's name, but on whether the conduct at issue is actually deceptive in practice. Given the absence of evidence showing any intent to mislead, the widespread and accepted nature of keyword advertising, and the functioning of modern search engines, we conclude that the practice of purchasing a competitor's name as a keyword -- without more -- does not constitute a violation of RPC 8.4(c). Our profession's commitment to honesty and dignity does not require insulating lawyers from competition where no misrepresentation occurs. It requires, instead, a clear focus on client protection. The ACPE correctly determined that keyword advertising -- absent deception -- does not violate RPC 8.4(c).

D.

We also find that the alleged conduct does not violate RPC 8.4(d). RPC 8.4(d) makes it professional misconduct for lawyers to engage in conduct that is "prejudicial to the administration of justice." The rule prohibits "particularly egregious conduct" that "flagrantly violat[es] . . . accepted professional norms." Helmer, 237 N.J. at 83 (quoting Hinds, 90 N.J. at 632). Because we find the advertising practice here is not deceptive or misleading, we also find that it does not rise to the level of particularly egregious conduct.

32

E.

In light of those conclusions, however, the Court still faces the simultaneous challenge of enabling attorneys to advertise using the most state-of-the-art technology while protecting the interests of the public, the integrity of our profession, and the administration of justice. This has necessitated additional precautions as attorney advertising has evolved over the years. For example, attorneys are required to maintain "[a] copy or recording of an advertisement or written communication . . . for three years after its dissemination along with a record of when and where it was used." R. 7.2(b). Unlike other jurisdictions, "New Jersey does not require lawyers to submit their advertisements for pre-publication review." Advisory Comm. on Pro. Ethics & Comm. on Att'y Advert., Notice to the Bar: Proposed Amendments to Rules of Professional Conduct 7.2 and 1.6 (Apr. 24, 2018).

And so, given our ruling today, we add the below precautionary disclaimer to assure that New Jersey attorneys continue to advertise in a way that is transparent and ethical.

Any attorney who purchases the name of a competitor attorney or a law firm's name as part of a keyword advertising campaign, must now include the

33

following disclaimer on any landing page to which the paid ad directs a consumer:[9]

> You arrived at this page via a paid advertisement on [insert name of search engine provider] through paid keyword search results. This website and the legal business it describes are affiliated only with [insert name of purchasing attorney] and the other attorneys referenced within this website.

The above language will permit any consumer, as well as the competitor attorney and firm whose name is being used, to understand how this sponsored ad appeared in a search results page.

## IV.

In sum, we hold that the use of a competitor's name or law firm's name in keyword advertising does not violate the RPCs. Prospectively, attorneys who wish to use this practice must use the above disclaimer, as directed. The practice at issue here is not inherently illicit, misleading, or deceitful. For these reasons, we affirm Opinion 735, as modified.

---

[9] Nothing in the record suggests that an attorney has control over the appearance, language, or content of a link that appears in either an organic or sponsored search result. However, attorneys are responsible for the content that appears in their website and must now ensure that this disclaimer is prominently displayed should they purchase the proper names of attorneys and their law firm in a keyword advertising campaign.

CHIEF JUSTICE RABNER and JUSTICES PATTERSON and WAINER APTER join in JUSTICE NORIEGA's opinion.  JUSTICE FASCIALE filed a dissent.  JUSTICE PIERRE-LOUIS did not participate.

JUSTICE FASCIALE, dissenting.

The legal profession is among the most unique and demanding in our country. Attorneys spend their entire careers building a reputation in the legal community not only as accomplished attorneys, but also as honest and trusted professionals. Perhaps they write journal articles, lead pro bono efforts, teach as adjunct legal professors, or regularly appear as panelists in continuing legal education courses in order to build a respected reputation among judges, other attorneys, and clients.

The question in this appeal is whether it is permissible under the Rules of Professional Conduct (RPC) for an attorney to purchase a competitor's name, without consent, as a keyword search term for the sole purpose of secretly trading on the competitor's hard-earned reputation for personal financial gain.

I would hold that this method of deceptive advertising -- to secretly appropriate for oneself the earned good will and reputation of another lawyer or firm solely for personal financial gain -- violates RPC 8.4(c)'s prohibition

1

against engaging "in conduct involving dishonesty, fraud, deceit, or misrepresentation."

The New Jersey Advisory Committee on Professional Ethics (ACPE) Opinion 735 and the majority erroneously permit such conduct by New Jersey lawyers.

I therefore dissent.

## I.

"It is professional misconduct for a lawyer to . . . engage in conduct involving dishonesty, fraud, deceit or misrepresentation . . . ." RPC 8.4(c). Although RPC 8.4(c) does not define dishonesty, deceit, or misrepresentation, I look to their ordinary meaning. IE Test, LLC v. Carroll, 226 N.J. 166, 182 (2016) ("Interpreting the statutory text, '[w]e ascribe to the statutory words their ordinary meaning and significance[.]'" (alterations in original) (quoting DiProspero v. Penn, 183 N.J. 477, 492 (2005))).

Black's Law Dictionary defines dishonesty, deceit, and misrepresentation. "Dishonesty" is "[d]eceitfulness as a character trait; behavior that deceives or cheats people; untruthfulness; untrustworthiness." Black's Law Dictionary 589 (12th ed. 2024). "Deceit" is "[t]he act of intentionally leading someone to believe something that is not true; an act designed to deceive or trick." Id. at 509. "Misrepresentation" is "[t]he act or

2

an instance of making a materially false or misleading assertion about something, usu[ally] with the intent to deceive." Id. at 1195.

RPC 8.4 covers not only the way attorneys practice law but also how they conduct business. Michels & Hockenjos, N.J. Attorney Ethics 9 (2025). "Any misbehavior, private or professional, which reveals lack of the character and integrity essential for the attorney's franchise constitutes a basis for discipline." In re La Duca, 62 N.J. 133, 140 (1973) (quoting In re Mattera, 34 N.J. 259, 264 (1961)). RPC 8.4(c) covers conduct that does not rise to the level of a crime. Michels & Hockenjos, at 732; see also In re Wysoker, No. DRB 00-219 (Apr. 3, 2001) (slip op. at 8) (rejecting the argument that RPC 8.4(c) encompasses only "grave misconduct").

In general, discipline has been imposed under RPC 8.4(c) when there is evidence of intentional misconduct.

> Discipline has been imposed on the basis of RPC 8.4(c) in various settings in which the record demonstrates intentional misconduct. See, e.g., In re Prothro, 208 N.J. 340 (2011) (attorney violated RPC 8.4(c) by knowingly making a false statement to a disciplinary authority); In re Trustan, 202 N.J. 4 (2010) (attorney violated RPC 8.4(c) by knowingly making false statements to a third party and offered evidence he knew was false); In re Stahl, 198 N.J. 507 (2009) (attorney violated RPC 8.4(c) where he knowingly made false statements to a law tribunal and offered evidence he knew was false); In re Marshall, 196 N.J. 524 (2008) (attorney violated RPC 8.4(c) where she

3

assisted her client in conduct she knew was illegal or fraudulent, and made a false statement of material fact to a third party); In re Tan, 188 N.J. 389 (2006) (attorney violated RPC 8.4(c) by knowingly making false statements on his bar application).

[In re Hyderally, 208 N.J. 453, 460-61 (2011).]

As I will explain in further detail, the purchase of a competitor's name, without consent, as a keyword search term solely for personal financial gain involves intentional misconduct.

## II.

Under Opinion 735, "a lawyer may, consistent with the rules governing attorney ethics, purchase an internet search engine advertising keyword that is a competitor lawyer's name, in order to display the lawyer's own law firm website in the search results when a person searches for the competitor lawyer by name." ACPE Op. 735, 225 N.J.L.J. 2155, 2156 (Aug. 12, 2019). Attorney advertising in that manner is known as leeching[1] and involves intentional

[1] The Michigan Bar Commission on Professional and Judicial Ethics has described the intentional misconduct termed "leeching" as follows:

Attorney A launches a keyword campaign using the name of Attorney B or Attorney B's law firm as keywords. If a consumer conducts an internet search for Attorney B's law firm, depending on variables such as the cost of the keyword advertising campaigns and

4

misconduct that RPC 8.4(c) prohibits. Opinion 735 acknowledges that another method of advertising, known as "hijacking,"[2] violates RPC 8.4(c) because it involves intentional, deceptive misconduct. In my view, so does the aforementioned leeching.

To leech, the advertising attorney must take several deliberate steps, including: (1) selecting whose name they would like to purchase; (2) creating an ad copy; (3) specifying target options; and (4) selecting a bid amount. This is all done without the consent of the person whose name is secretly being

> the words used in the consumer's search, it is possible for Attorney A's advertisement to appear alongside or even before Attorney B's own site or advertisements. As a result, a consumer who has conducted an internet search specifically for Attorney B's website may end up following an advertisement linked to Attorney A's website instead.
>
> [Mich. Bar Comm'n on Pro. & Jud. Ethics, Op. RI-385 (2022).]

[2] Opinion 735 correctly prohibits "hijacking," which is when a lawyer purposefully inserts, or pays an internet search engine company to insert, that lawyer's own hyperlink in a competitor's hyperlink to directly divert the user to that lawyer's webpage when the user tries to access the competitor's searched-for webpage. ACPE Op. 735, 225 N.J.L.J. at 2156. The ACPE reasoned that "hijacking" violates RPC 8.4(c) because "surreptitiously redirecting a user from the competitor's website to the lawyer's own website is purposeful conduct intended to deceive the searcher for the other lawyer's website." See ibid. I adopt the term "hijacking" as used by the ACPE during oral argument.

purchased. When a user searches a query containing a keyword, that triggers an automatic auction, where the search engine assesses the relevancy of keywords, sets bid amounts, and ranks each ad within the auction. The advertising attorney generally pays on a cost-per-click (CPC) basis, meaning they are charged by the search engine according to how many times users click on their ad. Many factors impact whether paid ads will appear; whether they appear above, below, or to the side of organic results; and in what format. Inherent in all those steps is the advertising attorney's intent "to deceive the searcher for the other lawyer's website." Cf. ACPE Op. 735, 225 N.J.L.J. at 2156 (banning hijacking for the same reason). The submissions to the Special Adjudicator did not include any responses by purchasing attorneys or firms, but just as Opinion 735 inferred intent to deceive behind hijacking, I do the same for leeching.

As the Maryland State Bar Association Committee on Ethics has explained, "[t]he core reason for purchasing as a keyword the name of another lawyer or law firm is to appropriate for oneself the earned reputation of another lawyer or firm in order to further one's own financial interests." Md. State Bar Ass'n, Inc. Comm. on Ethics, Ethics Docket No. 2022-02 (2023). "[S]uch conduct is inherently deceptive." Ibid. The North Carolina State Bar Ethics Committee agrees, finding that competitive keyword searching

6

is intentionally purchasing the recognition associated with [a competitor's] unique law firm trade name to direct -- if not divert -- consumers to [the advertising lawyer's] website. Doing so creates confusion for consumers who are specifically looking for [the competitor's] website based upon a search of [the competitor's] specific and unique law firm trade name.

[N.C. State Bar, Formal Ethics Op. 4 (2023).]

See also Mich. Bar Comm'n on Pro. & Jud. Ethics, Op. RI-385 at 3 (2022) ("[T]he practice of using another attorney's name, without consent, in order to increase traffic to one's own website is in and of itself deceptive."); Ohio Bd. of Prof. Conduct, Op. 2021-04 (2021) ("The purchase and use of a competitor lawyer's or law firm's name as a keyword for advertising is an act that is designed to deceive an Internet user and thus contrary to Prof. Cond. R. 8.4(c).").

Although the Court in Hyderally declined to find an RPC 8.4(c) violation because the non-certified attorney did not direct his website designer to include the New Jersey Supreme Court Certified Attorney seal and had not derived any benefit from it, 208 N.J. at 457, 461, the same cannot be said for the leeching advertising method that Opinion 735 permits. The only reason to purchase the keyword name of another lawyer or law firm is to attract prospective clients and thus derive a benefit from the purchase. By doing so, the advertising attorney seeks to benefit from the reputation and goodwill of,

7

or imply they are affiliated with, the competitor attorney. The majority's disclaimer solution admits as much.

Relatedly, the Committee on Attorney Advertising (CAA) has not hesitated to regulate misleading websites that guide users to attorneys who have purchased the exclusive rights to a geographical area. CAA Op. 43, 205 N.J.L.J. 155, 155-56 (July 4, 2011). The CAA concluded that a specific website that matched prospective clients with attorneys based solely on their zip code without the clients' knowledge was misleading in violation of RPC 7.1(a). Id. at 156. It found that form of attorney advertising misleading based on its omission of operative facts. Ibid. The CAA reasoned "that the website limit[ed] access to information, both by permitting only one attorney to participate per geographical area and by burying the list of participating attorneys." Id. at 155.

Although this dissent is premised on a different RPC violation, leeching can likewise have the same effects of burying attorneys' webpages and limiting users' access to information. For example, Google ads can often take up most of the first page of a search result, and "[g]iven that 75% of people don't scroll past page 1, those Adverts can really take up people's attention and clicks." The Latest Google Ads Research from Varn 2022, Varn Media (Sept. 22, 2022), https://varn.co.uk/09/22/latest-google-ads-research-2022-

8

varn. Thus, just as the CAA has regulated the content and operation of attorney advertising within websites pursuant to 7.1(a), CAA Op. 43, 205 N.J.L.J. at 155-56, this Court and the ACPE should likewise prohibit inherently misleading advertising by lawyers pursuant to RPC 8.4(c).

Although the majority points out that organic results receive higher click-through rates than paid advertisements because of users' perceived trustworthiness of organic results and possibility of ad fatigue, that assertion overlooks evidence that most users cannot distinguish between organic results and advertisements. In a recent Varn survey, 68.2% of respondents were unable to recognize a Google ad in the search results. See https://varn.co.uk/ 09/22/latest-google-ads-research-2022-varn.[3] That is an increase of over ten percentage points from 2018, which may be because paid ads have increasingly looked more like organic search results in recent years. Compare

_____

[3] That statistic comes from a 2022 Varn survey, relied on by the Special Adjudicator, of over 1,000 respondents in the United Kingdom across all age groups: out of the 31.8% that recognized Google ads, 78.6% did not click on them. See https://varn.co.uk/09/22/latest-google-ads-research-2022-varn. That survey builds on an independent survey Varn conducted in 2018 consisting of 803 respondents. In 2018, 57.5% of respondents were unable to recognize Google ads. The 2018 survey found that the percentage of people unaware of the difference between organic listings and Google ads increased with age, and younger people avoided clicking ads at a higher percentage than older people. Varn Original Research: Almost 60% of People Still Don't Recognise Google Paid Ads When They See Them, Varn Media (Jan. 18, 2018), https://varn.co.uk/01/18/varn-original-research-almost-60-people-still-dont-recognise-google-paid-ads-see.

Varn Original Research:  Almost 60% of People Still Don't Recognise Google Paid Ads When They See Them, Varn Media (Jan. 18, 2018), https://varn.co.uk/01/18/varn-original-research-almost-60-people-still-dont-recognise-google-paid-ads-see, with https://varn.co.uk/09/22/latest-google-ads-research-2022-varn.

Recent academic research has reached similar results.  A representative online survey of 2,012 German internet users revealed only 29% of users knew how paid ads differ from organic ads.  Dirk Lewandowski & Sebastian Schultheiß, Public Awareness and Attitudes Towards Search Engine Optimization, 42 Behav. & Info. Tech. 1025, 1032 (2023).  Correct answers to the survey correlated with lower ages, higher levels of education, and search engine optimization affinity among respondents.  Ibid.  As users confuse organic and paid results, this may lead to a situation where users -- particularly more vulnerable users -- place more trust in the first few search results than what is warranted.

Although actual user confusion is important, this is a professional ethics case, rather than a tort or trademark infringement case where one seeks and must prove damages or the number of prospective clients lost through

leeching.[4]  Thus, actual user confusion is not required to find a violation of the RPCs.  I highlight the findings of the international surveys and academic research available to buttress the point that leeching is inherently deceptive. This Court's focus should be on the advertising attorney's intentional, dishonest, and deceptive conduct, even before a user clicks on the site, rather than the outcome of every search.

## III.

The majority asserts that "the results are mixed" on whether competitive keyword advertising violates the rules of professional conduct in other jurisdictions.  But most jurisdictions to consider the question have held that competitive keyword advertising violates their respective versions of RPC 8.4(c).  Md. State Bar Ass'n, Inc. Comm. on Ethics, Ethics Docket No. 2022-02 (2023) ("[S]uch conduct is inherently deceptive, especially to the unsophisticated consumer, evidences a lack of professional integrity and calls into question the trustworthiness of the lawyer who does so."); Mich. Bar

---

[4]  See Eric Goldman & Angel Reyes III, Regulation of Lawyers' Use of Competitive Keyword Advertising, 2016 U. Ill. L. Rev. 103, 111 n.42 (2016) ("[T]rademark law only protects against very specific types of confusion."); see also Lerner & Rowe, PC v. Brown Engstrand & Shely LLC, 119 F.4th 711, 726 (9th Cir. 2024) (affirming the district court's grant of summary judgment in favor of The Accident Law Group (ALG) because "ALG's use of the 'Lerner & Rowe' mark is not likely to cause consumer confusion" for purposes of federal trademark legislation).

Comm'n on Pro. & Jud. Ethics, Op. RI-385 (2022) ("The use of a competitor's name or tradename without consent in competitive keyword advertising is inherently deceptive and a violation of MRPC 8.4(b)."); Ohio Bd. of Prof. Conduct, Op. 2021-04 (2021) ("The use of another lawyer's name, without consent, to increase traffic to one's own website and to further one's own financial and business interests displays a lack of professional integrity. It calls into question the lawyer's trustworthiness, sense of fairness to others, and respect for the rights of others, including those of fellow practitioners."); Miss. Bar, Ethics Op. No. 264 (2022) ("The practice of using John Doe's firm name, likeness, or trademarked materials without permission from John Doe would constitute, false, misleading and deceptive communication, and is not permissible."); N.C. State Bar, Formal Ethics Op. 4 (2023) (holding that the intentional selection of a unique firm trade name as a keyword for advertising is prohibited under North Carolina's Rule of Professional Conduct 8.4(c) unless the firm's trade name is itself a "generic and geographically based trade name that also serves as a reasonably common search term for consumers seeking legal services").

In the past, the South Carolina Supreme Court reprimanded an attorney for leeching. See In re Naert, 777 S.E.2d 823, 824 (S.C. 2015) (reprimanding an attorney who used opposing counsels' names as keywords in an advertising

12

campaign, which the attorney admitted was in violation of the state's Lawyer's Oath to "pledge[] to opposing parties and their counsel fairness, integrity, and civility in all written communications and to employ only such means consistent with trust, honor, and principles of professionalism").

In contrast, only a few jurisdictions have found that purchasing the names of competitors as keywords is not a violation of the rules of professional conduct. See Prof. Ethics Comm. for the State Bar of Tex., Op. No. 661 (2016) (slip op. at 3) ("In the opinion of the Committee, given the general use by all sorts of businesses of names of competing businesses as keywords in search-engine advertising, such use by Texas lawyers in their advertising is neither dishonest nor fraudulent nor deceitful and does not involve misrepresentation."); accord S.C. Ethics Advisory Op. 20-01 (2020).[5]

---

[5] I reject the notion that Habush v. Cannon, 828 N.W.2d 876 (Wisc. Ct. App. 2013), fits in this category because the decision did not consider any rules of professional conduct. Instead, in Habush, the Wisconsin Court of Appeals held that a lawyer's purchase of competitor lawyers' names as keywords in internet search engines did not violate the Wisconsin right of privacy statute because the "use" of the competitors' names was not visible to the user. Id. at 881-84. Admitting that "the question is a close one," the court reasoned that competitive keyword advertising is the digital parallel of permissibly locating a new law office next to a competitor's office with the intent of soliciting the individuals who arrive at the competitor's office "because of the value associated with the [competitor firm's] name[]." Id. at 883-84.

I disagree. Leeching is unlike an advertising attorney placing a billboard next to a competitor's sign or office. Adjacent billboards are readily apparent

13

IV.

Despite the growing national trend in the majority of jurisdictions, Opinion 735 and the majority rely on the reasoning of the Texas and Wisconsin decisions in holding that purchase of competitor names as keywords does not violate RPC 8.4(c) by assuming both the advertising attorney and the competitor attorney will appear in the search and that the advertising attorney will be marked as "paid or 'sponsored.'" ACPE Op. 735, 225 N.J.L.J. at 2156. There are several problems with that approach.

First, relying on search engines' complex, proprietary, and ever-changing policies and algorithms to regulate attorney leeching does not further the goals of our ethical rules. In 2022, after public backlash about the blurring of ads and organic search results, Google began replacing the "Ad" label with a "Sponsored" label, purportedly to ensure ads are clearly labeled. See Matt G. Southern, Google Makes Ads More Distinguishable from Organic Results,

_____

to the prospective client, while leeching is discreetly done behind the backs of the prospective client and competitor attorney whose name the advertising attorney purchased as a keyword. The scenarios are further distinguishable when considering the opaque nature of algorithms used by search engines to rank results, and the resulting user unawareness of this problem. See Jenna Burrell, How the Machine 'Thinks': Understanding Opacity in Machine Learning Algorithms, Big Data & Soc'y 1, 1 (2016) ("They are opaque in the sense that if one is a recipient of the output of the algorithm (the classification decision), rarely does one have any concrete sense of how or why a particular classification has been arrived at from inputs.").

14

<u>Search Engine J.</u> (Oct. 17, 2022), https://www.searchenginejournal.com/ google-makes-ads-more-distinguishable-from-organic-results/468042. But there is no indication that change is permanent. And it can lead to more user confusion, as an ad that is labeled "sponsored" does not say <u>who</u> sponsored it. Indeed, in a recent survey, 32% of 2,012 German internet users did not know that Google's main revenue comes from advertising and only 42% knew there is a difference between organic and paid search results. Lewandowski & Schultheiß, 42 <u>Behav. & Info. Tech.</u> at 1031-32, 1037. The majority's instruction for users to "narrow" their search beyond an attorney's proper name assumes that users are familiar with keyword technology, possess additional identifying information, and are ultimately able to distinguish organic from paid advertisements. Such assumptions are unsupported and misplaced.

Second, the majority's decision runs counter to this Court's long-standing tradition of holding attorneys to the highest of standards in their advertising practices, emphasizing that "[i]f unrestricted advertising by attorneys represents a threat to the qualities of that profession that serve society, it is clearly our responsibility to guard against it." <u>In re Pet. of Felmeister & Isaacs</u>, 104 N.J. 515, 544 (1986). <u>See also</u> <u>In re Carlsen</u>, 17 N.J. 338, 346 (1955) ("In democracies there is no higher calling than the

15

administration of justice in which attorneys play an important part.  It is vital that they be honorable [individuals], and in their professional work they are rightly held to high ethical and moral standards."); Felmeister & Isaacs, 104 N.J. at 536-37 ("We do not believe that the Constitution requires that the rules governing attorney advertising be the same as those applicable to beer, automobiles, or casino hotels. . . .  There is a significant difference in the level of consumers' knowledge (or ignorance) of material products and related services and their knowledge of legal services.").

The United States Supreme Court has expressed the same sentiment. See Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, 425 U.S. 748, 773 n.25 (1976) ("Physicians and lawyers, for example, do not dispense standardized products; they render professional services of almost infinite variety and nature, with the consequent enhanced possibility for confusion and deception if they were to undertake certain kinds of advertising."); Ohralik v. Ohio State Bar Ass'n, 436 U.S. 447, 461 (1978) ("The Bates Court did not question a State's interest in maintaining high standards among licensed professionals.  Indeed, to the extent that the ethical standards of lawyers are linked to the service and protection of clients, they do further the goals of 'true professionalism.'"  (footnote omitted)).

Third, putting the onus on the user, rather than regulating the attorney's conduct in the first instance, runs contrary to our ethical rules that serve to protect the public. Compare Prof. Ethics Comm. for the State Bar of Tex., Op. No. 661 (2016) (slip op. at 2) ("Moreover, since a person familiar enough with the internet to use a search engine to seek a lawyer should be aware that there are advertisements presented on web pages showing search results, it appears highly unlikely that a reasonable person using an internet search engine would be misled into thinking that every search result indicates that a lawyer shown in the list of search results has some type of relationship with the lawyer whose name was used in the search."), with In re Wilson, 81 N.J. 451, 456 (1979) ("[T]he principal reason for discipline is to preserve the confidence of the public in the integrity and trustworthiness of lawyers in general."), and Ohralik, 436 U.S. at 468 ("The facts . . . also demonstrate the need for prophylactic regulation in furtherance of the State's interests in protecting the lay public.").

V.

This brings me to a final point about whether prohibiting inherently misleading attorney advertising infringes on attorneys' free speech rights. It does not.

17

"[A]dvertising by lawyers [is] a form of commercial speech entitled to protection by the First Amendment." Peel v. Att'y Registration & Disciplinary Comm'n, 496 U.S. 91, 100 (1990). Commercial speech is "expression related solely to the economic interests of the speaker and its audience." Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y., 447 U.S. 557, 561 (1980).

But commercial speech that is false, deceptive, or misleading is subject to prohibition. See Va. State Bd. of Pharmacy, 425 U.S. at 771-72. And there is less leeway afforded to misleading commercial speech than there is to other forms of misleading speech:

> Indeed, the public and private benefits from commercial speech derive from confidence in its accuracy and reliability. Thus, the leeway for untruthful or misleading expression that has been allowed in other contexts has little force in the commercial arena. In fact, because the public lacks sophistication concerning legal services, misstatements that might be overlooked or deemed unimportant in other advertising may be found quite inappropriate in legal advertising. For example, advertising claims as to the quality of services -- a matter we do not address today -- are not susceptible of measurement or verification; accordingly, such claims may be so likely to be misleading as to warrant restriction. Similar objections might justify restraints on in-person solicitation.
>
> [Bates v. State Bar of Ariz., 433 U.S. 350, 383-84 (1977) (footnote omitted) (citations omitted).]

18

In addition, "[t]he determination whether an advertisement is misleading requires consideration of the legal sophistication of its audience. Thus, different degrees of regulation may be appropriate in different areas." Id. at 383 n.37 (citation omitted).

> The public's comparative lack of knowledge, the limited ability of the professions to police themselves, and the absence of any standardization in the "product" renders advertising for professional services especially susceptible to abuses that the States have a legitimate interest in controlling.
>
> Thus, the Court has made clear in Bates and subsequent cases that regulation -- and imposition of discipline -- are permissible where the particular advertising is inherently likely to deceive or where the record indicates that a particular form or method of advertising has in fact been deceptive. . . .
>
> . . . But when the particular content or method of the advertising suggests that it is inherently misleading or when experience has proved that in fact such advertising is subject to abuse, the States may impose appropriate restrictions. Misleading advertising may be prohibited entirely.
>
> [In re R.M.J., 455 U.S. 191, 202-03 (1982) (emphases added).]

This method of attorney advertising is inherently misleading and deceptive to users, as the Varn surveys and academic studies discussed above demonstrate. Although the Special Adjudicator found that "experts agree that paid search ads do not receive an inherent advantage over organic searches," in

19

the context of the First Amendment, it is user confusion and inherent deception that matters, not click-through rates or outcomes. Cf. First Resort, Inc. v. Herrera, 860 F.3d 1263, 1267-68, 1270, 1275-76 (9th Cir. 2017) (upholding an ordinance that banned untrue or misleading statements as applied to a business which employed Google Adwords to reach its intended audience).

On the other hand, "[t]ruthful advertising related to lawful activities is entitled to the protections of the First Amendment." R.M.J., 455 U.S. at 203. This dissent would not seek to impose restraints on buying generic search terms, geographic search terms, or common trade names, such as "family law attorney" or "Bergen County attorney." See also N.C. State Bar, Formal Ethics Op. 4 (2023) (holding that the intentional selection of a unique firm trade name in a keyword search is prohibited under North Carolina's Rule of Professional Conduct 8.4(c), but that prohibition does not apply when the trade name is a common search term). Any suggestion by the majority that I am prohibiting advertising of such terms, or that I am "chilling permissible advertising and restricting consumer access to legal services based on vague allegations of reputational appropriation" is respectfully misplaced.

VI.

I agree with the New Jersey State Bar Association's unadopted comment to RPC 8.4(c):

20

> It is a violation of RPC 8.4(c), representing dishonesty, fraud, deceit, or misrepresentation, for a lawyer to purchase another lawyer's or law firm's name as a keyword search term from internet search engines to use in the lawyer's own keyword advertising. The purchase of the recognition and reputation associated with a lawyer's or law firm's name to direct consumers to another lawyer's website is neither fair nor straightforward and is misleading.

That comment encompasses an attorney's proper name and law firm name. Given the common practice of including proper names within firm names, I agree that the purchase of both names as keywords should not be permitted. See generally RPC 7.5 (governing the use of proper names and trade names in law firm names). That comment is also broad enough to cover a law firm purchasing its own lawyer's proper name, which avoids the Attorney General's contention that it would be difficult to enforce between firms having purchased their former lawyers' proper names. Applying that comment prospectively will put lawyers on notice that they should not purchase other lawyers' or firms' proper names, or they may be subject to an ethics complaint, and that they would have to offer proof that they did not engage in leeching. Any enforcement or "proof" problems to which the majority calls attention do not lessen the need to regulate attorney misconduct in the first instance.

## VII.

"It is undisputed that an attorney's reputation is [one's] currency. A client's decision to retain a lawyer is based predominantly, if not exclusively, on the lawyer's good professional standing." R.M. v. Sup. Ct. of N.J., 185 N.J. 208, 221-22 (2005). To protect attorneys' goodwill and reputation, I would affirm Opinion 735's ban of hijacking and vacate its endorsement of leeching because I conclude that the purchase of another attorney's or law firm's proper, unique name violates RPC 8.4(c). In my view, doing otherwise is at the expense of our principles of professionalism. See N.J. Comm'n on Professionalism in the Law, Principles of Professionalism 1, https://njsba.com/wp-content/uploads/2023/11/Principles-of-Professionalism-2020.pdf (last rev. 2020) ("To opposing counsel, a lawyer owes a duty of respect, courtesy and fair dealing . . . ."). I embrace the notion that "[l]awyers should engage in . . . advertising . . . in a dignified, responsible, and honest manner." Ibid. (emphases added).

I therefore agree with the New Jersey State Bar Association, Bergen County Bar Association, Masters Marketing Group, New Jersey Association for Justice, New Jersey Defense Association, and the majority of jurisdictions around the nation that have considered this question.

For the foregoing reasons, I dissent.